# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

---

JOSEPH CHRISTIAN THORESEN,

                                    Case No. 21-cv-2459 (JRT/ECW)

          Petitioner,

v.                                  **REPORT AND RECOMMENDATION**

WARDEN SHERLINDA WHEELER,

          Respondent.

---

This matter is before the undersigned United States Magistrate Judge on Petitioner

Joseph Christian Thoresen's application for a Writ of Habeas Corpus by a Person in State

Custody arising under 28 U.S.C. § 2254 (Dkt. 1). This case has been referred to the

undersigned for a report and recommendation pursuant to 28 U.S.C. § 636 and Local

Rule 72.1. For the reasons set forth below, this Court recommends dismissal of this

action.

## I.    FACTUAL BACKGROUND

The State of Minnesota charged Thoresen with first-degree premeditated murder.

*See State v. Thoresen* (*Thoresen I*), 921 N.W.2d 547, 548 (Minn. 2019). The Minnesota

Supreme Court reported the following details about the events underlying Petitioner's

criminal charges, as well as his trial and convictions:

> On June 21, 2016, David Haiman was killed on a remote trail in Itasca
> County. Following a police investigation, Thoresen was charged with several
> offenses, including first-degree premeditated murder. Minn. Stat. §
> 609.185(a)(1) (2018). His alleged accomplice, Kayleene Greniger, pleaded
> guilty to second-degree intentional murder and was sentenced to 30 years in

prison. As a condition of her plea agreement, Greniger testified against Thoresen at his jury trial.

According to Greniger, she and Thoresen were romantically involved and lived together in Grand Rapids when the victim was killed. On June 20, 2016, she and Thoresen smoked methamphetamine and marijuana, drank alcohol, and used cocaine with Haiman at their apartment. Thoresen, who was more than 6 feet tall and weighed about 200 pounds, "aggressive[ly]" told Haiman, who was 5 feet, 5 inches tall and weighed about 180 pounds, that they needed to talk in the bedroom. Greniger, who is about 4 feet, 11 inches tall and weighed about 100 pounds, went to the bedroom with them. After they entered the bedroom, Thoresen and Greniger tied Haiman to a chair and repeatedly hit him.

Lending support to Greniger's testimony about the assault she and Thoresen committed against Haiman in their apartment, a witness, J.D., testified that she observed that Haiman had multiple injuries that were consistent with being tied up and beaten. More specifically, Haiman told J.D. that Thoresen and Greniger had tied him up and would not let him go to work. Another witness, J.G., testified that he saw Thoresen throw Haiman up against the wall and later saw Haiman tied to a chair and lying on the floor of the bedroom. Another witness testified that he saw blood splatter on Thoresen's pants.

Greniger testified that while Haiman remained bound to the chair, Thoresen removed Haiman's keys and phone from his pocket and took his car, leaving Haiman tied up.  Hours later, Thoresen untied Haiman and escorted him to Haiman's car, a maroon two-door sedan. When Greniger joined them a few minutes later, she saw Thoresen's machete between the driver's-side door and the seat. Thoresen's friend, R.G., testified that Thoresen and Greniger came to his house with a man who remained in the back seat of the "maroon" car they drove. Thoresen told R.G. that Thoresen "was looking for something to use to put a farm animal down that was injured and couldn't be saved." R.G. understood that to mean that Thoresen was going to kill a farm animal, but he did not see any farm animals with Thoresen and Greniger that day. According to Greniger's testimony, Haiman sat in the back seat as Thoresen then drove the trio to J.D.'s house, where they used more methamphetamine. There, Greniger and Thoresen took J.D.'s four-wheeler out for a ride on J.D.'s property, leaving Haiman and J.D. behind. Greniger testified that there was a baseball bat on the back of the four-wheeler. During their ride, Thoresen stopped, turned the four-wheeler off, and told Greniger that they were going to kill Haiman. Consistent with Greniger's testimony, J.D. told the jury that Greniger and Thoresen drove her four-wheeler around the

2

property. Because J.D. was not watching closely, she admitted that she did not know whether they stopped during the ride. Thoresen and Greniger returned to J.D.'s house after the four-wheeler ride and consumed more methamphetamine with J.D. and Haiman. Greniger saw Thoresen grab two knives from J.D.'s house as they left and put them in Greniger's purse. She also saw the baseball bat in the car next to the machete.

Greniger testified that with Thoresen driving and Haiman in the back seat, they next drove down a "trail in the woods," hit a puddle of mud, and the car started steaming. Thoresen stopped the car and told Haiman to check the oil. Greniger let Haiman out on the passenger side of the two-door sedan and put her head down to start rolling a cigarette. Greniger testified that Thoresen, meanwhile, got out of the driver's side with a baseball bat in his hand, walked to the front of the car, and hit Haiman on the head twice, knocking him to the ground. Greniger grabbed the knives from her purse, and Thoresen and Greniger stabbed Haiman multiple times. Greniger then cut off Haiman's head with the machete. Thoresen grabbed Haiman's body by the ankles and dragged it into the woods. He stuck a knife in Haiman's temple, placed the head in a bag, and threw the bag into the woods.

A friend of Thoresen's, T.C., provided support for some of Greniger's testimony about the events in the woods. Greniger testified that, after the murder, she and Thoresen drove to T.C.'s house in Haiman's car. T.C. verified that Thoresen drove a red sedan to his house. Thoresen told T.C. that the car belonged to "a kid" whom Thoresen "had hit . . . in the head with a bat twice" and whose head he had cut off with a machete. T.C. also testified that he saw a bat among Thoresen and Greniger's things when they came to his house. Later, T.C. found a bat in his yard with a large red stain on it that he presumed to be blood and burned it out of concern that it could implicate him in the murder. Investigators also found a partially burnt knife near T.C.'s fire pit.

When investigators later visited the apartment of Greniger and Thoresen, Greniger brought them to the area where Haiman's body was. Though investigators did not find Haiman's body until a few days later, Greniger had brought them to within 30 yards of the remains. Haiman's head was on the north side of the trail, and his body was on the south side of the trail, about 150 feet from his head. The medical examiner testified that there was a large fracture on the side of Haiman's head that would have caused "significant" brain damage. His clothing had holes in it that appeared to be from stabbing, but the body had decomposed too much to verify whether there were stab wounds.

Investigators also searched the apartment that Thoresen and Greniger shared. There, investigators found evidence that corroborated Greniger's testimony. Specifically, they observed multiple areas with blood stains. They found a number of items that appeared to contain blood stains, including a pair of black tennis shoes, two pairs of jeans, a pink towel, and a rope. Investigators also found a machete with blood stains on the blade between the mattress and the box spring of the bed in the apartment. DNA on the machete's handle did not match Thoresen's DNA, but Greniger and Heiman could not be excluded as matches. Greniger's fingerprint was on the machete.

Investigators also searched Haiman's car. They found a fillet knife, which had blood on the blade, in the trunk, and blood stains on the outside of the car, near the passenger side door. The blood on the knife and car matched Haiman's DNA. Thoresen and T.C. were eventually arrested after they fled from a police officer while driving Haiman's maroon car. Thoresen was released, but that arrest led investigators to look into his connection to Haiman's disappearance. Thoresen was eventually arrested and charged for his role in Haiman's death.

Before trial, Thoresen requested jury instructions about the credibility of addict or substance abuser testimony and the credibility of accessory-after-the-fact testimony. The State opposed both instructions, and the district court denied Thoresen's requests. Multiple witnesses, including Greniger, J.D., T.C., and J.G., admitted to being under the influence of drugs or alcohol during events that they testified to and that those substances affected their memory or perception. T.C. admitted to destroying evidence and acknowledged that he hoped his cooperation with the prosecutor would help him avoid prosecution. The court instructed the jury both before and after testimony about the role of the jury in considering and weighing the credibility of testimony.

The jury found Thoresen guilty of first-degree premeditated murder, as a principal and as an aider and abettor. *See* Minn. Stat. § 609.185(a)(1). The district court entered a conviction on principal liability for first-degree premeditated murder and sentenced him to life in prison without the possibility of release.

*Thoresen I,* 921 N.W.2d at 548-51 (footnotes omitted).[1]

---

[1]    "[A] determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1); *see also Lee v.*

The jury also found Thoresen guilty of first-degree murder while committing a kidnapping, as a principal and as an aider and abettor. *Id.* at 551 n.2. In addition, the jury found Thoresen not guilty of second-degree intentional murder and second-degree unintentional murder while committing a second-degree assault. *Id.* Thoresen was ultimately sentenced to life in prison without the possibility of release. *Id.* at 548.

## II.    PROCEDURAL BACKGROUND

### A.    Petitioner's Initial Appeal before the Minnesota Supreme Court

In his initial May 25, 2018 appeal brief to the Minnesota Supreme Court, Petitioner raised two issues for appeal through his legal counsel: (1) evidence of his guilt for premeditated murder was insufficient because the prosecution did not offer evidence to sufficiently corroborate Greniger's testimony on premeditation under Minn. Stat. § 634.04, which requires corroboration of accomplice testimony; and (2) the district court committed reversible error when it denied his request for jury instructions on evaluating credibility of substance abusers and a person who could be charged with aiding an offender.[2] (Dkt. 13-8 at 9, 27-45.) The Minnesota Supreme Court held that the evidence corroborating Greniger's testimony was legally sufficient:

> When the evidence presented at trial is viewed in a light most favorable to the prosecution, it restores our confidence in the truth of Greniger's accomplice testimony. J.G. corroborated Greniger's accounting of the hours leading up to the murder when he testified that he saw Thoresen throw

---

*Gammon*, 222 F.3d 441, 442 (8th Cir. 2000) (citing 28 U.S.C. § 2254(e)(1)) ("[A] federal court . . . presumes that the state court's factual determinations are correct," and such a presumption "may be rebutted only by clear and convincing evidence.").

[2]    Petitioner did not file a pro se brief with the Minnesota Supreme Court as part of his initial appeal.

Haiman up against the wall and later saw Haiman tied to a chair and lying on the floor of the bedroom. J.D. corroborated Greniger's account of the beating Thoresen gave Haiman in their apartment, when she testified that she observed that Haiman had multiple injuries that were consistent with being tied up and beaten. J.D. also corroborated the ride Greniger and Thoresen took on her four-wheeler. T.C. corroborated Greniger's testimony that some of the murder weapons—a bat and a knife—were in the car that Thoresen was driving. Thoresen told T.C. that he hit "a kid" over the head with a baseball bat, then cut his head off. T.C. also testified that Greniger became upset with Thoresen for telling people about what they planned and did together. Finally, the autopsy and forensic evidence corroborated Greniger's testimony that Thoresen struck Haiman in the head with a baseball bat and then stabbed him with a knife.

Although the corroborative evidence must in some substantial degree tend to point to the defendant's guilt, it need not "establish a prima facie case of the defendant's guilt." *Scruggs*, 421 N.W.2d at 713 (quoting *Adams*, 295 N.W.2d at 533). "The entire conduct of the accused may be looked to for corroborating circumstances, and if from those circumstances the connection of the accused with the crime may fairly be inferred, the corroboration is sufficient." *Rasmussen*, 63 N.W.2d at 3. The crime at issue here is first-degree premeditated murder. Premeditation requires that the defendant "consider, plan or prepare for, or determine to commit, the act referred to prior to its commission." Minn. Stat. § 609.18 (2018). "[A]n inference of premeditation may be supported by several categories of evidence, including planning activity, motive, the nature of the killing, and a defendant's actions following the killing." *State v. Petersen*, 910 N.W.2d 1, 7 (Minn. 2018) (citation omitted).

Beyond Greniger's testimony, there is independent evidence that Thoresen planned to kill Haiman. R.G. testified that Thoresen said he needed to put down a large farm animal, and R.G. understood that to mean that Thoresen was going to kill a large animal. R.G. did not see any farm animals, but he did see Haiman in the back seat of the car that Greniger and Thoresen arrived in. J.D. testified that the victim said Thoresen and Greniger would not let him leave to go to work. Thoresen drove Haiman and Greniger to an isolated area, and immediately after the murder, Thoresen hid the victim's body and head. T.C. testified that Greniger yelled at Thoresen for telling T.C. about what they did after they had planned the murder together. Thoresen continued driving the victim's car around until he was arrested. When this evidence is viewed in a light most favorable to the prosecution, we conclude that it points to Thoresen's guilt in some substantial degree.

> In sum, Thoresen's premeditated murder conviction does not violate Minn.
> Stat. § 634.04 because the corroborative evidence tends to affirm the truth of
> Greniger's accomplice testimony and to point to Thoresen's guilt.

*Thoresen I,* 921 N.W.2d at 552-53.  The Minnesota Supreme Court also held that the trial court did not abuse its discretion in declining to give the requested jury instructions under existing state law regarding the credibility of drug users or witnesses who could later be charged as accessories after the fact.  *Id.* at 553-54.

## B.    Writ of Certiorari

On March 27, 2019, Petitioner brought a petition for writ of certiorari before the United States Supreme Court.  (Dkt. 13-18.)  The only issue raised as part of this petition was "[w]hether the court below erroneously held, in conflict with the decisions of two circuits, that a special jury instruction was not warranted when considering the testimony of addicts using a combination of alcohol, cocaine and methamphetamine and the credibility of their corroborating testimony which was the essence of the States [sic] case."  (*Id.* at 2.)  The U.S. Supreme Court denied the petition on July 10, 2019.  *See Thoresen v. Minnesota*, 139 S. Ct. 2696 (2019).

## C.    Motion for Forensic Testing

On October 25, 2019, Thoresen moved the trial court for an order allowing blood testing and DNA testing to further identify the source(s) of the biological evidence related to his murder case, arguing that the test was available but not performed on 94% of the evidence secured at his apartment, and would show evidence materially relevant to his assertion of actual innocence—the DNA of persons or animals not associated with Haiman.  (Dkt. 13-14 at 1-2.)  Petitioner also filed a traverse dated December 19, 2019 in

support of his motion, asserting that the only DNA profile test done from Thoresen's apartment was one drop of what was identified as Haiman's blood from the bedroom closet mirror. (Dkt. 13-15 at 3.) According to Thoresen, the prosecutor used this one sample to represent that the rest of the samples taken were from Haiman, severely prejudicing him and that this was the result of a lack of diligence of his trial counsel. (*Id.*)

The trial court found that the only post-conviction relief that Thoresen sought was the additional testing pursuant to Minn. Stat § 590.01, as opposed to post-conviction relief based on ineffective assistance of counsel, and denied any additional testing on the basis that the samples at issue were available at trial. (Dkt. 13-13 at 3-6.) The trial court also concluded that additional testing could not demonstrate Thoresen's "actual innocence," given that the victim was not murdered in the apartment, the victim's blood was found in the apartment, and the testimony from witnesses at trial was that the victim was seen driving with Thoresen and the victim's blood was found in that vehicle. (*Id.* at 6.)

**D.    March 31, 2020 Petition for Postconviction Relief**

Petitioner filed a motion for post-conviction relief on March 31, 2020, seeking to vacate his conviction and seeking his release from prison based on claims of: (1) withheld exculpatory evidence, claiming law enforcement investigators withheld emails and interviews with potential witnesses; (2) plain error by the trial court when it allowed the indictment against him to stand; (3) that he was denied a fair trial, including on the basis that the indictment was based on perjured testimony, the charging document was

confusing, and the media coverage surrounding the case; (4) prosecutorial misconduct;

(5) ineffective assistance of counsel; (6) insufficient evidence for the conviction; and

(7) an additional request for Hematrace testing.  (Dkt. 13-12 at 3-22.)

On July 28, 2020, the district court denied the petition, and concluded, in part, that

Petitioner's attack on the indictment, right to a fair trial (including media influence),

prosecutorial misconduct, ineffective assistance from trial counsel, and insufficient

evidence claims were procedurally barred by *Knaffla*, in addition to failing on the merits.

(*Id.*)

> As part of its decision, the district court also noted as follows:
>
> Petitioner does reference ineffectiveness of appellate counsel in his petition, but he does not provide any specific allegations or facts. Pet'r's Mot. 60. Based on his submissions, it does not appear that Petitioner raised any specific allegations against his appellate counsel; all of his claims reference evidence and events at the jury trial. Thus, the Court does not consider a claim of ineffective assistance of appellate counsel.

(*Id.* at 20.)

## E.    Appeal of July 28, 2020 Order on Petition for Post-Conviction Relief

Petitioner appealed the July 28, 2020 order denying his postconviction petition to

the Minnesota Supreme Court.  (Dkt. 13-5.)

In his first claim, Petitioner argued that law enforcement and the prosecution

withheld, in violation of *Brady* and his due process right under the Fifth Amendment, the

interviews of R.D., J.P., and D.S., as well as 770 pages of Facebook material that were

mentioned in police reports, which were not available until after his first direct appeal.

(Dkt. 13-5 at 1.)  According to Petitioner, the information in the interviews were

important, as they contradict witnesses' statements regarding the bat allegedly used and its possession, as well as the identification of individuals in a vehicle that entered Petitioner's apartment.  (Dkt. 13-5 at 1-6.)  The Minnesota Supreme Court held that the interviews regarding evidence of the origin of the bat was not material and information regarding Greniger's timeline of events would not negate the substantial evidence that Thoresen killed Haiman.  *Thoresen v. State* ("*Thoresen II*"), 965 N.W.2d 295, 304-06 (Minn. 2021).  As for the Facebook posts, the court found that Thoresen's *Brady* claim was barred by *Knaffla*, as record shows that Thoresen knew that the State had the Facebook posts before both the jury trial and his direct appeal on the basis that the posts were seized pursuant to a July 2016 search warrant issued to Facebook, which was subsequently extended.  *Id.* at 307.

In his second claim on appeal, Petitioner argued that the indictment was fatally defective because it lacked the requisite specificity and language in form as it was insufficiently detailed; and on the basis that each count improperly charged both principal and accomplice liability, as opposed to having separate counts.  (Dkt. 13-5 at 6-10.)  The Minnesota Supreme Court held that this claim was barred by *Knaffla*, the indictment contained sufficient essential facts to notify Thoresen of the charges against him, he was able to mount a defense, and that principal and accomplice liability can be included in the same count under Minnesota law.  *See Thoresen II*, 65 N.W.2d at 306-08.

In his third claim on appeal, Petitioner argued that the trial court erred, despite the lack of an objection to stop prosecutorial misconduct, in denying such a claim, including the claim that the prosecution inappropriately told the jury how to view the evidence and

what to believe in his closing argument, misstated the evidence, withheld evidence, only

tested one blood sample, and offered perjured testimony. (Dkt. 13-5 at 10-12.) The

Minnesota Supreme Court held that this claim was barred by *Knaffla*, that none of the

prosecutor's statements, highlighted by Thoresen, were inaccurate, and that the

prosecution merely summarized the evidence in the closing argument. *See Thoresen II*,

965 N.W.2d at 308.

In his fourth claim on appeal, Petitioner asserted that the trial court erred in its

finding on judicial estoppel, dealing with the fact that Greniger changed her account of

who decapitated Haiman between her grand jury testimony and her trial testimony, and

his assertions that the grand jury was misled because information showing his

fingerprints were not on the murder weapons was not disclosed. (Dkt. 13-5 at 12-13.)

The Minnesota Supreme Court held that this claim was barred by *Knaffla*, and that

Minnesota Supreme Court did not recognize judicial estoppel. *See Thoresen II*, 965

N.W.2d at 308-09.

In his fifth claim on appeal, Petitioner asserted prosecutorial misconduct for:

allegedly failing to disclose "deals" the prosecution made with Greniger's brother and

T.C. and allowing witnesses to materially testify falsely to the grand jury given the

known evidence. (Dkt. 13-5 at 13-17.) The Minnesota Supreme Court held that this

claim was barred by *Knaffla*, as Thoresen was aware of the grand jury transcript and was

present for the trial. *See Thoresen II*, 965 N.W.2d at 309. The court also found that no

exception to *Knaffla* applied. *Id.*

In his sixth claim on appeal, Petitioner asserted ineffective assistance of trial and appellate counsel. Petitioner asserted that his trial counsel failed to file for a mistrial based on Greniger's testimony that she could not recall Petitioner's role in the murder and made prejudicial character statements related to sex, as well as admission of evidence related to sexual items. (Dkt. 13-5 at 17-18.) Petitioner also referred to the failure of trial counsel to challenge various aspects of the search warrants, the lack of blood and DNA testing of his apartment, and the failure to make a motion for change of venue based on publicity. (*Id.* at 18-20.) Similarly, in his tenth claim, Petitioner asserted ineffective assistance of appellate counsel for the failure to raise the legal claims the postconviction court had ruled were *Knaffla*-barred. (*Id.* at 29-31.)

With respect to these claims the Minnesota Supreme Court found as follows:

We agree that Thoresen's claims for ineffective assistance of trial counsel do not provide a basis for postconviction relief. Each of the errors identified by Thoresen are trial errors that either he knew or should have known at the time of his direct appeal. Further, except for the failure to demand further testing, the claims fail as a matter of law because Thoresen offers only conclusory assertions without detail, legal argument, explanation, or support. *See Crow v. State*, 923 N.W.2d 2, 10 (Minn. 2019) (stating that postconviction evidentiary hearing not required when claims "are based solely on conclusory, argumentative assertions without factual support" (citation omitted) (internal quotation marks omitted)). And Thoresen does not explain what potential information would have been gleaned from additional testing that would have resulted in a different outcome at trial. First, Haiman was not killed in Thoresen's apartment. Further, there was other testimony that Thoresen beat up Haiman in the apartment and that Haiman was tied up and bleeding on the floor. The testimony was corroborated by DNA evidence of blood in the apartment and [J.D.]'s testimony that Haiman was injured there. Therefore, Thoresen's claims of ineffective assistance of trial counsel fail.

Thoresen's claims of ineffective assistance of appellate counsel are not barred by *Knaffla* because he could not have brought these claims at the time of his direct appeal. Appellate counsel, however, do not have a duty to

include all possible claims on direct appeal and may choose to argue only the most meritorious claims. *See Schneider v. State*, 725 N.W.2d 516, 523 (Minn. 2007). Further, we have said that "[w]hen an appellant and his counsel have divergent opinions as to what issues should be raised on appeal, his counsel has no duty to include claims which would detract from other more meritorious issues." *Case v. State*, 364 N.W.2d 797, 800 (Minn. 1985). We will not second-guess appellate counsel's decision not to raise a claim that "counsel could have legitimately concluded would not prevail." *Reed*, 793 N.W.2d at 733 (citation omitted) (internal quotation marks omitted).

Thoresen's argument regarding ineffective assistance of appellate counsel is brief and vague. Without elaborating, Thoresen asserts that there was "a breakdown of communication between the Appellate Counsel and Petitioner, upon which the Appellate Counsel fell below a reasonable standard and has hindered Mr. Thoresen's due process right to bring proper and legitimate legal issues forward in his Post Conviction Relief Petition." That assertion is not specific enough to support postconviction relief.

Thoresen also conclusorily mentions that his appellate counsel did not raise or spot issues relating to deficiencies in the search warrants, items that were not produced to the defense, and trial counsel's failure to hire independent expert witnesses to testify in court to dispute the evidence that was presented against him. But he does not identify what experts trial counsel should have, but did not, hire or how they would have made a difference. We have reviewed the record and the district court's order rejecting Thoresen's claim that the search warrants were deficient and we find no error. Appellate counsel could have legitimately concluded that the argument would fail. And Thoresen does not identify the unproduced items that he now claims he knew about at the time of the direct appeal that appellate counsel should have challenged. Therefore, we conclude that, because Thoresen did not bear his burden to demonstrate by a preponderance of the evidence that appellate counsel's representation fell below a reasonable standard, he is not entitled to an evidentiary hearing.

*Thoresen II*, 965 N.W.2d at 310-11.

In his seventh claim on appeal, Thoresen asserted insufficient evidence of guilt based on: perjured testimony in the indictment; allegedly inadequate forensic evidence; no eyewitnesses to the murder except someone who admitted to murder and was looking at a severe sentence; and concocted evidence elicited from another individual trying to

get out of certain felonies.  (Dkt. 13-5 at 20.)  The Minnesota Supreme Court found that this claim was barred by *Knaffla*, as he knew the insufficiency-of-the-evidence claims at the time of his direct appeal.  *Thoresen II*, 965 N.W.2d at 311.

In his eighth claim on appeal, Petitioner sought further blood and DNA testing of his apartment.  (Dkt. 13-5 at 20-24.)  The Minnesota Supreme Court rejected this claim on the basis that it did not meet the requirements of Minn. Stat. § 590.01 necessary for the testing.  *Thoresen II*, 965 N.W.2d at 311.

In his ninth claim for relief on appeal, Petitioner noted errors with respect to search warrants, applications, seizures, as well as a possible *Miranda* violation.  (Dkt. 13-5 at 24-29.)  The Minnesota Supreme Court found Petitioner's claims regarding the alleged deficiencies in the search warrants and the alleged *Miranda* violations clearly barred by *Knaffla*, as their basis was available at the time of direct appeal.  *Thoresen II*, 965 N.W.2d at 311-12.

**F.    Petitioner's March 22, 2021 Second Petition for Post-Conviction Relief**

In his second Petition for Post-Conviction Relief, Petitioner raised a number of ineffective assistance of appellate counsel claims related to: appellate counsel's failure to raise prosecutor's improper remarks during closing arguments; failure to raise "in the record" and the trial court's failure to raise adequacy of jury instruction on direct appeal; and failure to raise the issue of improper admission of evidence.  (Dkt. 13-11.)  Petitioner asserted that due process protects his right to effective assistance of counsel on first appeal.  (*Id.*)

On May 10, 2021, the district court denied this post-conviction petition on procedural grounds, as the appeal on his first post-conviction was pending, and on the basis that the claims failed on the merits. (Dkt. 13-10.) Petitioner did not appeal this order.

## G.    Present Petition

As part of the present habeas Petition before the Court, filed on November 5, 2021, Petitioner asserts the followings grounds for relief:

> **GROUND ONE** – Insufficient Evidence: Only Evidence produced against Petitioner was only Non corroborated Testimony givin [sic] by Co-defender [sic] and other Accessory.

(Dkt. 1 at 5.) Petitioner also noted the absence of any corroborating physical evidence. (*Id.* at 18-19.)

> **GROUND TWO** – Testimony was givin [sic] by an individual who proclaimed he burnt Evidence in this investigation. Because "He didn't want to implicated."

(*Id.* at 7.)

> **GROUND THREE** – Judicial Error – Prosecutor Gained An Indictment through Perjured testimony from Co-defendant than proceeded to gain a Conviction after Co-defendant's supplement Plea deal stating she was the one who committed the murder.

(*Id.* at 8.) In addition, Petitioner asserted that the judge erred by allowing the indictment to stand, "which created a chaotic and confusing charging document which blurred the lines by means of charging different liabilities together. I.E. 'Either being aided by or aiding another' in the same counts." (*Id.* at 17.)

> **GROUND FOUR** – *Brady v. Maryland* – Found Police Interviews that
> contradicted Co-defendant and prosecutor's theory of events and supports
> other witnesses['] claims about events.

(*Id.* at 10.)  This included "Law Enforcement interviews of [R.D.], [J.P.], [D.S.] and 770

Emails were withheld. . . ."  (*Id.* at 17.)

> **GROUND FIVE** – DNA Testing.  Prosecution Presented during trial only
> presumptive tested articles of clothing and articles of blankets, towels.
> Prosecution presented as "Evidence" with no DNA or Hematrace testing.
> Only saying this is proof of a crime.  Apartment is over 40 years old with
> multiple people living there at the time of Alleged offense.

(*Id.* at 15.)

> **GROUND SIX** – Search Warrants.  Search Warrants issued had 2 different
> Addresses on them.  Affidavit for Search had 105 5th St Apt H.  While Search
> Warrant itself had 513 NE 2nd Ave. Apt. H.  Neither of which is Petitioner's
> Address. Rummaging Warrant, Affidavit also requested the premises of
> Outside the Apartment which was a public area with public washer and dryer.
> NS Items were to be seized.

(*Id.* at 16.)

> **GROUND SEVEN** – Prosecutorial Misconduct.
>
> The prosecutor withheld exculpatory evidence most favorable to Mr.
> Thoresen, consistently misrepresented and mis-characterized statements,
> presented inadmissible inflammatory evidence throughout the trial and
> closing argument. As County Attorney he used his capacities "of great
> power" to inject these untruths into the Grand Jury to obtain an indictment at
> all costs. Abused his power as Assistant County Attorney overseeing the
> Grand Jury to allow biased jurors to be seated who were tainted by the press
> (covered in VI Section A.). Abused his power as Assistant County Attorney
> overseeing the Grand Jury to allow Jurors with known personal relationships
> with States [sic] witnesses to be seated on the jury panel.

(*Id.* at 18.)

**GROUND EIGHT** – Ineffective Assistance of Counsel.

Mr. Thoresen's defense counsel fell short on their duty to properly represent him throughout the entire trial process. (1) From pretrial investigation of known facts, failure to investigate clients claims, failure to object to inflammatory prejudicial character assassination statements, not further testing BCA "evidence" and not challenging the States [sic] series of events with facts. Failure to report the contact between the Defense Investigator and co-defendants father. Failure to interview all the States [sic] witness and have character witnesses in support of Mr. Thoresen. (2) If the above failures were corrected the outcome would have been different.[3]

There is insufficient evidence to conclude beyond a reasonable doubt that Mr. Thoresen committed the charged offenses. There is no physical evidence only what the State claimed as corroborated evidence which does not stand up when put to scrutiny.

(*Id.* at 18-19.)

Respondent argues that Petitioner procedurally defaulted on Grounds Two, Three, Six, Seven, and Eight and a portion of Ground Four (dealing with the email/Facebook posts) because the Minnesota Supreme Court held they were barred under *Knaffla*, and therefore, the Court must dismiss the Petition as to these Grounds.  As to Grounds One and Five, Respondent argues that they concern questions of state law that cannot be reviewed in a federal habeas proceeding.  Finally, as to the *Brady* violations with respect to the withheld interviews under Ground Four, Respondent argues that the Minnesota

---

[3]     The Petition lacked any reference to an ineffective assistance of appellate counsel claim.  *See Fisherman v. West*, No. 19-CV-0180 (SRN/DTS), 2019 WL 1494608, at *1 (D. Minn. Mar. 13, 2019), *R. & R. adopted*, No. 19-CV-0180 (SRN/DTS), 2019 WL 1491791 (D. Minn. Apr. 4, 2019) ("Rule 2(c) of the Rules Governing Section 2254 Cases in the United States District Courts requires that a habeas corpus petition 'specify all the grounds for relief available to the petitioner" and "state the facts supporting each ground.'").

Supreme Court's ruling was not contrary to, and did not unreasonably apply, clearly established federal law. (Dkt. 11 at 14-31.)

In response to Respondent's procedural default arguments, Petitioner in his Traverse, stated that "his claims are constitutionally founded and expressly afforded by the 4, 5, 6, 14 Amendments. Hence forth supersedes and State procedure bar or default." (Dkt. 18 at 15, 21.) Petitioner also generally states that actual prejudice will show cause for default, and that the "failure to consider claims will result in MISCARRIAGE of Justice." (*Id.* at 21.) According to Petitioner, miscarriage of justice involved in this case is "actual innocence" of the First Degree Murder charge for which he was convicted. (*Id.* at 26-27.)

### III.    LEGAL STANDARD

A federal court's review of habeas corpus petitions filed by state prisoners is governed by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Habeas relief under § 2254 is warranted in three circumstances: (1) when a state court decision was contrary to clearly established federal law, (2) when a state court decision involved an unreasonable application of clearly established federal law, or (3) when a state court decision "was based on an unreasonable determination of the facts in light of the evidence presented." 28 U.S.C § 2254(d)(1), (2). Habeas relief is available to a state prisoner if "he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The Court's review is "limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 180-82 (2011).

A federal district court is not allowed to conduct its own de novo review of a prisoner's constitutional claims. *See Yarborough v. Alvarado*, 541 U.S. 652, 665 (2004) ("We cannot grant relief under AEDPA by conducting our own independent inquiry into whether the state court was correct as a *de novo* matter."). The "AEDPA . . . imposes a highly deferential standard for evaluating state-court rulings, and demands that state-court decisions be given the benefit of the doubt." *Renico v. Lett*, 559 U.S. 766, 773 (2010) (internal citations and quotation marks omitted). Under § 2254(d), a state court decision is "contrary to" the U.S. Supreme Court's precedent if it "arrives at a conclusion opposite to that reached by [the U.S. Supreme] Court on a question of law," or if it "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite to ours." *Williams v. Taylor*, 529 U.S. 362, 405 (2000); *see also Engesser v. Dooley*, 457 F.3d 731, 735-36 (8th Cir. 2006). A state court decision is an "unreasonable application" of U.S. Supreme Court precedent if it "identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 413. In such situations, the court must "ask whether the state court's application of clearly established federal law was objectively unreasonable." *Id.* at 409. A court may not find a state adjudication to be unreasonable "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411. Under this standard, courts "must deny a writ—even if [they] disagree with the state court's decision—so long as that decision is reasonable in view of all the circumstances." *May v. Iowa*, 251 F.3d 713, 716

(8th Cir. 2001) (citing *Williams*, 529 U.S. at 409-13). "To the extent that 'inferior' federal courts have decided factually similar cases, reference to those decisions is appropriate in assessing the reasonableness of the state court's resolution of the disputed issue." *Atley v. Ault*, 191 F.3d 865, 872 (8th Cir. 1999) (citation omitted).

In addition, when reviewing a state court decision, a federal habeas court "presumes that the state court's factual determinations are correct." *Lee v. Gammon*, 222 F.3d 441, 442 (8th Cir. 2000) (citing 28 U.S.C. § 2254(e)(1)). This deference applies to factual determinations made by the state trial and appellate courts. *See Sumner v. Mata*, 449 U.S. 539, 547 (1981). The petitioner has "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *Whitehead v. Dormire*, 340 F.3d 532, 539 (8th Cir. 2003).

## IV.   ANALYSIS

### A.   Claims Involving State Law - Grounds One and Five.

Under 28 U.S.C. § 2254(a), district courts can grant habeas petitions for those "in custody pursuant to the judgment of a State court only on the ground that he is in custody i**n violation of the Constitution or laws or treaties of the United States**" (emphasis added). This federal-law focus means that a § 2254 petitioner, such as Thoresen, cannot seek federal-court habeas relief for violations of state law. *See, e.g.*, *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011) (citations omitted); *Houston v. Janssen*, No. 15-CV-3075 (WMW/HB), 2016 WL 3004792, at *8 (D. Minn. May 3, 2016) (same), *R. & R. adopted*, 2016 WL 3014651 (D. Minn. May 24, 2016). Given this legal standard, the Court will

address Respondent's arguments that Grounds One and Five are state law claims that are
not reviewable in a federal habeas action.

### 1.    Ground One—Corroborating Evidence

As set forth previously, Ground One of the Petition asserts that there was
insufficient evidence to support Thoresen's conviction as the only evidence produced
against him was the "Non corroborated Testimony givin [sic] by Co-defender [sic] and
other Accessory" with respect to Greniger and T.C.  (Dkt. 1 at 5; Dkt. 18 at 17-18.)  The
Minnesota Supreme Court found that for the purposes of Minn. Stat. § 634.04, the
evidence sufficiently corroborated Greniger's testimony on premeditation.  *See Thoresen
I,* 921 N.W.2d at 551-52.  The Eighth Circuit has concluded that corroboration
requirements are matters of state law which do not implicate federal constitutional rights.
*See Loeblein v. Dormire*, 229 F.3d 724, 727 (8th Cir. 2000); *Harrington v. Nix*, 983 F.2d
872, 874 (8th Cir. 1993) ("There is . . . no constitutional requirement that accomplice
testimony be corroborated."); *Redding v. State of Minn.*, 881 F.2d 575, 578 (8th Cir.
1989), *cert. denied*, 493 U.S. 1089 (1990) (concluding that accomplice-corroboration
requirement was a matter of state law); *DuBois v. Lockhart*, 859 F.2d 1314, 1317 (8th
Cir. 1988) (citation omitted).  Indeed, the courts have concluded that the corroboration
requirement under Minn. Stat. § 634.04 does not warrant habeas relief:

> Davis next argues that his conviction was unconstitutional because it was
> based on uncorroborated witness testimony. See Minn. Stat. § 634.04
> (prohibiting a conviction based on accomplice testimony unless corroborated
> by other evidence that "tends to convict the defendant of the commission of
> the offense"). A violation of a state law regarding accomplice testimony,
> however, does not warrant federal habeas relief. *See Harrington v. Nix*, 983
> F.2d 872, 874 (8th Cir.1993) ("[S]tate laws requiring corroboration do not

implicate constitutional concerns that can be addressed on habeas review.").
The objection is therefore overruled.

*Davis v. Grandlienard*, No. CIV. 13-2449 DSD/JJK, 2015 WL 1522186, at *5 (D. Minn.

Mar. 31, 2015), *aff'd*, 828 F.3d 658 (8th Cir. 2016). Given that corroboration is a state

law issue that does not warrant federal habeas relief, Ground One of the Petition should

be dismissed.

### 2.   Ground Five—DNA and HemaTrace Testing

The entirety of Ground Five provides: "DNA Testing. Prosecution Presented

during trial only presumptive tested articles of clothing and articles of blankets, towels.

Prosecution presented as 'Evidence' with no DNA or Hematrace testing. Only saying

this is proof of a crime. Apartment is over 40 years old with multiple people living there

at the time of Alleged offense." (Dkt. 1 at 15.) Petitioner does not state a violation of

federal law with respect to this claim. Based on Petitioner's underlying state

proceedings, the Court discerns that Petitioner is arguing that the trial court erred in

denying his post-conviction request under Minn. Stat. § 590.01, subd. 1a,[4] for additional

---

[4]     Section 590.01, subd. 1a provides in part as follows:

Motion for fingerprint or forensic testing not available at trial. (a) A person
convicted of a crime may make a motion for the performance of fingerprint
or forensic DNA testing to demonstrate the person's actual innocence if:

(1) the testing is to be performed on evidence secured in relation to the trial
which resulted in the conviction; and

(2) the evidence was not subject to the testing because either the technology
for the testing was not available at the time of the trial or the testing was not
available as evidence at the time of the trial.

biological testing on samples, which the trial court denied on the basis that the evidence at issue was viable at trial.  Given that Petitioner's challenge amounts to a challenge under state law, no habeas relief is available to Petitioner under Ground Five.

**B.**    **Exhaustion and Procedural Default as to Grounds Two, Three, Six, Seven, Eight, and part of Claim Four (Facebook posts)**

An application for a writ of habeas corpus will only be granted if "the applicant has exhausted the remedies available in the courts of the state."  28 U.S.C. § 2254(b)(1)(A).  In conformance with the principles of comity and federalism, the exhaustion doctrine requires state courts to have a "full and fair opportunity to resolve federal constitutional claims before those claims are presented to the federal courts," *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999), where "the prisoner must 'fairly present' his claim in each appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim," *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (citation omitted).  Thus, "a prisoner must fairly present his federal constitutional claims to the **highest available state court**, (in Minnesota, the Minnesota Supreme Court), before seeking relief in federal court." *Fraction v. Minnesota*, 678 F. Supp. 2d 908, 916 (D. Minn. 2008) (emphasis added).

Fair presentment requires the prisoner to "refer to a specific federal constitutional right, a particular constitutional provision, a federal constitutional case, or a state case raising a pertinent federal constitutional issue."  *Cox v. Burger*, 398 F.3d 1025, 1031 (8th Cir. 2005).  Both the U.S. Supreme Court and the Eighth Circuit have noted that "[i]t is

---

Minn. Stat. § 590.01, subd. 1a.

not enough to recite only . . . the facts necessary to state a claim for relief, or to make a general appeal to a constitutional guarantee as broad as due process." *Turnage v. Fabian*, 606 F.3d 933, 936 (8th Cir. 2010) (internal quotation marks and citations omitted). A claim has not been fairly presented if the presiding court "must read beyond a petition or a brief (or a similar document) that does not alert it to the presence of a federal claim in order to find material, such as a lower court opinion in the case, that does so." *Baldwin*, 541 U.S. at 32. More specifically, "even if the opinion of the state court of appeals does not make any mention of a federal claim, a brief submitted to that court that sets forth the federal constitutional basis for a claim can satisfy the requirement that the petitioner 'apprise the state court of his claim that the . . . ruling of which he complained was not only a violation of state law, but denied him the due process of law guaranteed by the Fourteenth Amendment.'" *Fraction*, 678 F. Supp. 2d at 917 (quoting *Duncan v. Henry*, 513 U.S. 364, 366 (1995)). However, "[a] petitioner must present both the factual and legal premises of his claims to the state courts in order to exhaust the claims properly." *Dansby v. Hobbs*, 766 F.3d 809, 823 (8th Cir. 2014) (emphasis added). "The onus rests on the prisoner to present the substance of his federal claims in each appropriate state court . . . ." *Turnage*, 606 F.3d at 936 (quotation marks and citation omitted).

The U.S. Supreme Court has made clear that "a federal court may not review federal claims that were procedurally defaulted in state court—that is, claims that the state court denied based on an adequate and independent state procedural rule." *Davila v. Davis*, 137 S. Ct. 2058, 2064 (2017) (citations and footnotes omitted); *see also, e.g.*, *Barnett v. Roper*, 904 F.3d 623, 629 (8th Cir. 2018) (quoting *Davila*, 137 S. Ct. at 2052).

24

Under Minnesota law, where a defendant took a direct appeal, "all claims raised in the direct appeal as well as 'all claims known but not raised' at the time of the direct appeal are barred from consideration in any subsequent petitions for post-conviction relief." *Cooper v. State*, 745 N.W.2d 188, 190-91 (Minn. 2008) (quoting *Knaffla*, 243 N.W.2d at 741). Moreover, claims that were not available at the time of appeal, such as effective assistance of appellate counsel, are barred unless they are raised on the first post-conviction proceeding. *See Townsend v. State*, 723 N.W.2d 14, 19 (Minn. 2006) ("Townsend's current arguments about ineffective assistance of appellate counsel are focused on counsel in the direct appeal, *Townsend I*, and are barred because they were known and available at the time of the first post-conviction proceeding, *Townsend II*. Moreover, this same argument was considered and rejected in Townsend's first petition for postconviction relief.").

In this case, the Minnesota courts applied just such a rule to the claims in Grounds Two, Three, Six, Seven, Eight, and part of Ground Four (the 770 Facebook posts) of the instant Petition when Thoresen raised them in his postconviction-review petition. Specifically, the Minnesota Supreme Court agreed Minnesota's *Knaffla* rule barred consideration of the claims. *See Thoresen II*, 965 N.W.2d at 304-312. The *Knaffla* rule has repeatedly been determined to be the sort of adequate/independent state procedural rule that can trigger procedural default. *See, e.g.*, *Murphy v. King*, 652 F.3d 845, 849 (8th Cir. 2011); *Riddle v. Minnesota*, No. 20-CV-1262 (ECT/ECW), 2021 WL 799490, at *9 (D. Minn. Jan. 8, 2021) (quoting *Murray v. Hvass*, 269 F.3d 896, 899-900 (8th Cir. 2001)), *R. & R. adopted*, 2021 WL 795164 (D. Minn. Mar. 2, 2021). Indeed, here, "[t]he

Minnesota Supreme Court considered the claim[s] to be procedurally defaulted and the Court is obliged to respect the conclusion of the Minnesota Supreme Court on Minnesota procedure." *See Ali Elmi, v. Warden Guy Bosch*, No. 20-CV-2241 (JRT/HB), 2022 WL 5264246, at *3 (D. Minn. May 3, 2022), *R. & R. adopted sub nom.*, 22 WL 5249384 (D. Minn. Oct. 6, 2022) (citing *Murray v. Hvass*, 269 F.3d 896, 899 (8th Cir. 2001), *cert. denied*, 535 U.S. 935 (2002)).

Where a claim is procedurally defaulted, federal courts are prevented from adjudicating the claim on the merits unless a petitioner can demonstrate cause and prejudice, "or demonstrate[s] that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750 (internal quotation marks omitted).

"'[C]ause'. . . must be something external to the petitioner, something that cannot fairly be attributed to him . . . . For example, 'a showing that the factual or legal basis for a claim was not reasonably available to counsel . . . or that 'some interference by officials' . . . made compliance impracticable . . . .'" *Coleman*, 501 U.S. at 753 (quoting *Murray v. Carrier*, 477 U.S. 478, 488). "Prejudice" that will overcome a procedural default requires a petitioner to show "not merely that the errors at his trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Armstrong v. Kemna*, 590 F.3d 592, 606 (8th Cir. 2010) (emphasis omitted) (quoting *United States v. Frady*, 456 U.S. 152, 170 (1982)). In this case, Thoresen has not articulated the cause for his procedural default. While he asserts that the *Knaffla* rule is unconstitutional (Dkt. 18 at

21), the *Knaffla* rule has been "consistently followed" for decades and serves as an independent state-law basis for procedural default. *See Murray v. Hvass*, 269 F.3d 896, 899-900 (8th Cir. 2001) (citations omitted); *see also Jackson v. Smith*, No. CV 17-2354 (JRT/BRT), 2018 WL 626530, at *6 (D. Minn. Jan. 30, 2018) (applying *Knaffla* to bar a *Brady* claim). Since Thoresen has not satisfied the cause component required to overcome his claims' procedural default, it is unnecessary to address the prejudice component. *See Edwards v. Bolin*, No. 19-CV-2984 (PJS/LIB), 2020 WL 4756574, at *16 (D. Minn. July 22, 2020) (citation omitted), *R.&R. adopted*, 2020 WL 4809688 (D. Minn. Aug. 17, 2020).

The "fundamental miscarriage of justice" exception is available only upon a "showing, based on new evidence, that 'a constitutional violation has probably resulted in the conviction of one who is actually innocent.'" *Brownlow v. Groose*, 66 F.3d 997, 999 (8th Cir. 1995) (quoting *Schlup v. Delo*, 513 U.S. 298, 327 (1995)), *cert. denied*, 516 U.S. 1161 (1996). In other words, a petitioner cannot merely point to errors that allegedly occurred during the course of his state criminal proceeding; he must instead offer some new evidence which affirmatively demonstrates that he is, in fact, innocent of the crime for which he was convicted. *See Edwards*, 2020 WL 4756574, at *16 (citations omitted) ("Likewise, Petitioner cannot meet the 'fundamental miscarriage of justice' exception because he failed to present any 'reliable new evidence' providing clear and convincing proof that he is actually innocent."). Here, the "fundamental miscarriage of justice" exception is inapplicable, as other than asserting that failing to consider his claims constitutes a miscarriage of justice (Dkt. 18 at 13, 21, 26-27), Thoresen has failed to

provide any new evidence demonstrating that he is innocent of the crime for which he was convicted, as more fully set forth below with respect to Ground Four. (*See infra,* Section IV.C.)

For all of these reasons, Thoresen's procedural default of his claims cannot be overcome, and this Court cannot adjudicate the Petition on its merits as to those claims. As such, the claims under Grounds Two, Three, Four, Six, Seven, and Eight of the Petition and related submissions, save for the *Brady* violation claim addressed below, should be dismissed on this basis.

**C.    Ground Four *Brady* Violation (Law Enforcement Interviews)**

As set forth previously, Ground Four, alleging a *Brady* violation, asserts that the prosecution withheld interviews from potential witnesses that were favorable to Thoresen, and even if they were not favorable the jury deserved to hear them to make a fair and informed decision.  (Dkt. 1 at 10; Dkt. 18 at 7).  Specifically, Petitioner relies on the statements given by R.D., J.P., and D.S.  (Dkt. 18 at 7.)  He claims that R.D. stated that his four-wheeler had no basket or storage rack and when asked if he was missing any bats, he only stated he was missing black and white bats.  (*Id.* at 7-8.)  According to Petitioner, this statement is consistent with witness J.D., who testified that she did not see a bat in the four-wheeler, and contradicts the testimony of Greniger and T.C. that the bat used on the victim was wood grained and was obtained from the four-wheeler.  (*Id.* at 8.) Petitioner claims that if the bat was never taken from J.D.'s residence, as both R.D. and J.D. testified, that would mean the only persons that would have had possession of the bat

would have been T.C. and Greniger when they destroyed the bat because T.C.'s DNA was on the bat, and he did not want to get in trouble. (*Id.*)

As to J.P., Petitioner asserts that his statement to police was that J.P. talked to a K.B. who stated that T.C. was "driving the car[,]" that they "were looking for something down by his place[,]" and that T.C. had a bat that was T.C.'s bat. (*Id.* at 8-9.) With respect to J.P. and R.D.'s statements, Petitioner claims that this evidence supports his assertion that the bat used on the victim never came from J.D.'s home as claimed by Greniger, and is proof of perjury by Greniger and served as evidence that T.C. burned the bat because he alone is the one who wielded it against the victim, and that the evidence "if available at the jury trial would have been enough to impeach Ms. Greniger's and [T.C.'s] testimony and would have changed the outcome of the trial by showing that Kayleene Greniger and [T.C.] not only lied because of their guilt, but were able to curry their self-serving testimony to carry favor with the prosecution, quid pro quo." (*Id.* at 9.)

With respect to D.S.'s statement, Thoresen asserted as follows:

Officer Kevin Ott interviewed [D.S.] on 6-28-26 @ 16:08 (Exhibit 8. [D.S.] Police Interview). [D.S.] is a resident of the same apartment complex that Mr. Thoresen resided at and stated she was up for work and was sitting in her vehicle having a cigarette in her car between 2:00 AM and 2:30 AM when she seen 2 individuals driving a baby blue 4 door blue car (Addendum page 40) go up and exit Mr. Thoresen's apartment (Addendum. pg. 37). [D.S.] identified the individuals in a police lineup shown to her by officer Ott; their identity was never revealed in the investigation (Addendum pages 40-42 and again on page 47). This shows that [J.G.] Jr.'s statement and testimony was false and committed perjury. The police, investigators or Prosecution never handed over the interview or exhibits showing the 2 individuals entering or exiting the premises to the Defense Counsel, this deliberate exclusion of evidence shows a propensity that the Prosecution and Investigators not only willingly but also knowingly violated *Brady* forming a biasness towards the Petitioner.

(*Id.* at 9-10.)

Respondent argues that Thoresen is not entitled to relief because he cannot demonstrate that the Minnesota Supreme Court's denial of his *Brady* claim was contrary to, or unreasonably applied, clearly established federal law when it found that none of the interviews satisfied all of the elements necessary for a *Brady* violation. (Dkt. 11 at 27-31.)

"'Under *Brady v. Maryland*, 'suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.'" *White v. Steele*, 853 F.3d 486, 490 (8th Cir. 2017) (quoting *United States v. Pendleton*, 832 F.3d 934, 940 (8th Cir. 2016), quoting *Brady*, 373 U.S. at 87). "There are three components to a *Brady* violation: the evidence at issue must be favorable to the accused, either because it is exculpatory or has impeachment value; the state must have suppressed the evidence, either willfully or inadvertently; and prejudice must have resulted." *Kennell v. Dormire*, 873 F.3d 637, 639 (8th Cir. 2017) (citing *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999)). "Prejudice results if the suppressed evidence is material, which for Brady purposes occurs 'when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different," or in other words, when the evidence "undermines confidence in the outcome of the trial.'" *Id.* (quoting *Turner v. United States*, —— U.S. ——, 137 S. Ct. 1885, 1893 (2017)).

As to the first interview, R.D., the father of J.D. (a witness for the prosecution), told police about his four-wheeler and his possession of bats. (Dkt. 20.) In particular,

R.D. noted that he was not around when Thoresen was at the house. (*Id.*at 2.) He told law enforcement that he has a four-wheeler that did not have a basket. (*Id.* at 2-3.) He also claimed to have black and white wood bats in his garage. (*Id.* at 3.) R.D. did not know if they were missing and was going to check for police. (*Id.* at 4.)

While neither party provided the Court with J.P.'s interview, Petitioner asserts that J.P.'s statement to police was that he talked to a K.B. who stated that T.C. was "driving the car[,]" that they "were looking for something down by his place[,]" and that T.C. had a bat that was T.C.'s bat. (Dkt 18 at 8-9.)

With respect to [D.S.], she stated during her interview with police that on June 21, 2016, she was out for a smoke at about 2:34 to 3:00 a.m. in her vehicle, when she saw two young men come out of an apartment, not Thoresen or Greniger, who went into a blue vehicle next to her, then observed the driver get out to go back into the apartment, come back to the vehicle (although it did not appear he brought anything back down), and then leave the parking lot. (Dkt. 20-1.)

With respect to these interviews, the Minnesota Supreme Court held as follows:

**[R.D.] Interview**

[R.D.] is the father of [J.D.], a witness for the prosecution. He owns the land that, before the murder, Thoresen traveled to with Kayleene Greniger and Haiman. During his interview, [R.D.] stated that he was not at the residence on the day in question, that he did not have a basket on the back of his four-wheeler, and that he had two baseball bats in the garage, one painted black and one painted white. Thoresen additionally claim that [R.D.] suggested that any baseball bat he may have was a little slugger. [R.D.] stated that he did not believe any of the bats were missing.

Thoresen claims that [R.D.]'s statement contradicts the trial testimony of Kayleene Greniger. Kayleene Greniger testified that it was at the [D.]

residence on a four-wheeler ride that Thoresen told her that they were going to kill Haiman. Kayleene Greniger also testified that she saw a wooden baseball bat on the back of a four-wheeler and later "saw the baseball bat in the car next to the machete." *Thoresen*, 921 N.W.2d at 549–50.

The postconviction court concluded that, assuming [R.D.]'s interview was withheld and it could have been used to impeach Kayleene Greniger, Thoresen was still conclusively entitled to no relief because the interview was not material. The court reached this conclusion because Thoresen was unable to show that [R.D.]'s interview would have led to a different verdict.

We agree with the postconviction court that the allegedly suppressed evidence was not material. We assume, as the district court did, that Thoresen meets the suppression prong of *Brady*. Thoresen also meets the favorability prong of *Brady* because the evidence could have been used to impeach Kayleene Greniger's testimony.

But Thoresen's argument fails on the materiality prong. There is not a reasonable probability that, had Thoresen been in possession of [R.D.]'s interview, the outcome of the jury trial would have been different. The origin of the bat would not outweigh the evidence that Thoresen hit Haiman in the head with a bat. The evidence at the jury trial included testimony about Haiman's autopsy showing that he was struck in the head with a blunt object, Kayleene Greniger's testimony that she saw Thoresen strike Haiman in the head twice with a bat, and Thoresen's own statement to [T.C.] that he struck a kid in the head twice with a bat. *See Thoresen*, 921 N.W.2d at 550, 552. The withheld interview was not material because there is not a reasonable probability that the outcome of the jury trial would have been different had Thoresen had the interview before trial. Therefore, the postconviction court did not abuse its discretion by finding that the failure to disclose [R.D.]'s interview did not violate *Brady*.

**[J.P.] Interview**

[J.P.] gave a statement to investigators about [T.C.] [J.P.] said about [T.C.], "But any, anyway, um, ah he's been trying to fight all this stuff in court ah about what he didn't do and what he did do and that he had a bat, that was his bat. I guess somebody hit the guy in the head or something or?" Thoresen asserts that [J.P.]'s statement implicates [T.C.] in Haiman's murder. He argues that the statement shows that the bat was never in Thoresen's hands and that the bat never came from the [D.] residence.

The postconviction court found that Thoresen failed to show how this evidence was favorable or material. The court stated that [J.P.]'s interview was "vague, general, and full of conjecture" and could not show that [T.C.] murdered Haiman. The court also stated that the origin of the bat is largely immaterial.

We agree with the postconviction court. Again, we assume that Thoresen meets the suppression prong of *Brady*. But Thoresen has failed to show how [J.P.]'s interview is favorable or material.

Evidence is favorable when it is exculpatory or could be used for impeachment purposes. *Walen*, 777 N.W.2d at 216. Thoresen's assertion that [J.P.]'s vague and speculative statement is exculpatory and shows that [T.C.] murdered Haiman is without merit. Even if [T.C.] was the owner of the baseball bat, [J.P.]'s statement does not implicate [T.C.] in the murder. [J.P.] stated that "somebody hit the guy in the head or something." He did not say who did so. Although [T.C.] may have been the owner of the bat, this fact does not make him the one who used it to kill Haiman, and thus Thoresen's argument that [J.P.]'s interview is exculpatory (and so favorable) fails. Further, there is no reasonable probability that the result of the proceeding would have been different had Thoresen possessed [J.P.]'s statement before trial. Substantial evidence, including Kayleene Grainger's [sic] testimony, supports the jury's conclusion that Thoresen hit Haiman in the head with the bat.

**[D.S.] Interview**

Thoresen argues that the prosecution withheld the interview of [D.S.] He asserts that [D.S.]'s interview contradicts the testimony of Kayleene Greniger's brother, [J.G.] [D.S.] told investigators that she was sitting in her car the early morning of June 21, 2016 (the day of the murder), and saw two young gentlemen get into a baby blue four-door vehicle at around 2:30 a.m. [D.S.] identified the two men and told investigators that neither of the people she saw were Kayleene Greniger or Thoresen.

Once again, we assume that Thoresen meets the suppression prong of *Brady*. Further, while Thoresen fails to identify how this evidence would be used to impeach [J.G.], if we follow the lead of the district court and assume that [J.G.] was one of the men identified, we could reasonably conclude that [D.S.]'s statement could be used to contradict [J.G.]'s testimony regarding when he traveled to and from the apartment on the night before the murder. Accordingly, we can foresee how the interview could have been favorable as impeachment evidence.

But even if we accept that argument, [D.S.]'s statement is immaterial as there is no reasonable probability that the result of the proceeding would have been different. Impeaching [J.G.]'s credibility regarding his timeline would not negate the substantial evidence that Thoresen killed Haiman. [J.G.] was not present at the time of the murder. His testimony at the jury trial focused on events before the murder: that Thoresen beat up Haiman in the apartment and that Haiman was tied up and bleeding on the floor. The testimony was corroborated by DNA evidence of blood in the apartment and [J.D.]'s testimony that Haiman was injured there. Because [D.S.]'s statement was not material, the district court did not abuse its discretion by concluding that the failure to disclose [D.S.]'s interview did not violate *Brady*.

*Thoresen II*, 965 N.W.2d at 304-06 (emphasis in original) (footnote omitted).

As set forth previously, the AEDPA offers a framework for analyzing the state court's legal conclusions, its application of federal law, and its factual findings. *See* 28 U.S.C. § 2254. By applying *Brady*, the Minnesota Supreme Court used the correct U.S. Supreme Court precedent to resolve Petitioner's claim. *See Collier v. Norris*, 485 F.3d 415, 421 (8th Cir. 2007) (applying *Brady* to the prosecutorial suppression of impeachment evidence in a § 2254 case).[5] Therefore, Petitioner cannot claim the Minnesota Supreme Court acted "contrary to" federal law. *See* 28 U.S.C. § 2254(d)(1).

Further, the Minnesota Supreme Court's decision did not result in an "unreasonable application of federal law." *Williams*, 529 U.S. at 408. The Minnesota Supreme Court analyzed the materiality and importance of the undisclosed information as required under *Brady*. *See Strickler*, 527 U.S. at 281-82. Nor has Petitioner demonstrated that the state courts' resolution was "based on an unreasonable

---

[5]     Courts may "look at circuit precedent to ascertain whether it has already held that the particular point in issue is clearly established by Supreme Court precedent. . . ." *Marshall v. Rodgers*, 569 U.S. 58, 64 (2013).

determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). As found by the Minnesota Supreme Court, the origin of the bat did not outweigh the evidence that Thoresen hit the victim in the head with the bat nor does J.P. 's statement support the assertion that someone else other than Thoresen, such as T.C., hit the victim with a bat. Moreover, the Minnesota Supreme Court did not err in finding evidence regarding the timeline of events occurring before the murder, by someone who did not witness the murder, would not change the outcome, especially given DNA evidence of blood in the apartment and J.D.'s testimony that Haiman was injured there.

Indeed, the Minnesota Supreme Court's decision with respect to lack of materiality as to the interviews, on the basis that Petitioner cannot show a "reasonable probability" that the result would have been different, is supported by the record presented to the jury as a whole,

Greniger testified at trial that she and Thoresen hit the victim, tied up the victim to a chair with rope in Thoresen's apartment and continued to hit him, with Thoresen hitting the victim with his fists multiple times, his horse whips, and a Leatherman—knocking the victim to the ground. (Tr. 1099-1105.)[6] Thoresen hit the victim while he was on the ground bound to the chair and when the victim cried asking them to stop, Thoresen just hit him some more. (Tr. 1105.) Greniger and Thoresen left the victim at the apartment and when they returned, they untied the victim, and they all did drugs together. (Tr.

---

[6]     *See* Trial Transcript ("Tr."), 31-CR-16-1826 (Itasca Cty. Ct. July-Aug. 2017), https://publicaccess.courts.state.mn.us/CaseSearch (last visited Dec. 5, 2022).

1105-1114.)  The victim was bloody at this time.  (Tr. 1115.)  Then they all went down to the victim's vehicle and on the way out of the apartment, Thoresen grabbed a machete and placed it inside of the vehicle.  (Tr. 1115-17.)  Greniger testified that they went to a female's house (J.D.) and did some drugs, and then she went on a four-wheeler ride with Thoresen, during which they decided that they would kill the victim.  (Tr. 1117-19.)  When they got back to J.D.'s house, they went inside and grabbed knives and a baseball bat that was "on" the four-wheeler.  (Tr. 1117-20.)

Greniger testified that while they were driving, the vehicle went through a puddle causing the vehicle to steam, and at that point, Thoresen told the victim to get out of the vehicle to check it, and it was at this time that Thoresen hit the victim with a bat twice, crushing his skull.  (Tr. 1120-23, 1230.)  Then both she and Thoresen began to stab the victim multiple times, including in the chest.  (Tr. 1123-24, 1231.)  Greniger further testified that she did cut off the victim's head, with Thoresen telling her to swing harder with the machete.  (Tr. 1125-26, 1146, 1231.)  The baseball bat, the knives, and machete were placed back into the vehicle and the body and head were discarded in the woods. (Tr. 1126-27.)  The bat and knife were grabbed by T.C. and Thoresen and burned.  (Tr. 1129-31.)  Greniger testified that she placed the machete back into Thoresen's apartment underneath the bed.  (Tr. 1135-36.)

R.G. testified that Thoresen and Greniger stopped by in June 2016 in an older maroon vehicle with a male passenger in the back.  (Tr. 1260-61.)  The male passenger stayed in the car while Thoresen and Greniger spoke with R.G. inside the residence.  (Tr.

1261.)  Thoresen talked about putting an injured farm animal down and was looking for something to put down or kill the animal.  (Tr. 1262-63, 1266.)

J.D. testified that Thoresen came to her home in June 2016 with Greniger and the victim at about 2:00 p.m.  (Tr. 1269-70.)  The victim had a scrape on his eye, looked like his wrists and waist had been tied up, and indeed that is what the victim told her.  (Tr. 1274, 1284.)  The victim also told her that they had his vehicle and would not him leave. (Tr. 1275, 1283.)  [J.D.] placed some medicine on the victim's scrape.  (Tr. 1275.)  The victim looked panicked.  (Tr. 1285.)  At this point in time, Thoresen and Greniger were out for a ride on her father's four-wheeler.  (Tr. 1275-76.)  According to [J.D.], Thoresen, Greniger, and the victim ultimately all left in the vehicle.  (Tr. 1277.)

[T.C.] testified that he observed Thoresen and Greniger driving in a red vehicle that belonged to a kid.  (Tr. 1338.)  [T.C.] further testified that Thoresen claimed to [T.C.] that he had hit the kid twice in the head with a bat and stated laughingly that he had cut the person's head off.  (Tr. 1338.)  He also discovered a wooden bat in a bag that Thoresen brought to his yard that had a large red stain that looked like blood, so he panicked and burned it in a firepit he was using to burn other garbage because he was afraid that Thoresen and Greniger were trying to set him up.  (Tr. 1338-45.)

Dr. Michael McGee, a medical examiner, testified that he conducted an autopsy of the victim.  (Tr. 1409.)  He opined that the cause of death was the result of homicidal violence, including a large significant fracture of the right side of the skull that would have caused extensive damage to the brain, and without medical attention the person

would have died; stab wounds; and a traumatic separation of the subject's head. (Tr. 1422-23, 1427.)

The Bureau of Criminal Apprehension witnesses testified about a number of blood samples in Thoresen's apartment and vehicle, including on a machete, fillet knife, and that at least one sample in the apartment matched the victim's DNA, as did the blood sample on the knife found in the trunk of the vehicle and on the passenger side of the vehicle. (Tr. 1556-1600, 1610-11.) The sample from the machete blade also tested positive for the victim. (Tr. 1614, 1621.)

[J.G.] Jr. testified that he was at Thoresen's apartment at about sunset when Thoresen had an argument with the victim, ordered the victim to put his hands behind him and ordered his sister, Greniger, to tape or tie the victim up. (Tr. 1644-46.) He testified that he returned to the apartment about an hour and half later (after selling drugs) to find his sister and Thoresen with the bloodied victim on the ground. (Tr. 1649-50.) Thoresen later showed up with blood on his leg and he claimed that he kicked or killed a cat. (Tr. 1653.) This was confirmed by another witness [B.A.], who testified there was blood on Thoresen's leg and that he claimed it was from a cat. (Tr. 1236.)

While in jail, Thoresen spoke with his father over phone and told him that he messed up and that was looking at 40 years to life in prison. (Tr. 1695.) On another prison call, Thoresen admitted that he got the victim and was going to claim self-defense, but denied cutting the victim's head off. (Tr. 1696-98.)

Given this evidence, Petitioner fails to demonstrate a reasonable probability that, had the interviews been disclosed to the defense, the result of the trial would have been

different.  "A federal court may not issue the writ simply because it concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly."  *Lyons v. Luebbers*, 403 F.3d 585, 592 (8th Cir. 2005).  "Rather, that application must also be unreasonable.  In other words, the state court's application might be erroneous in [the federal court's] independent judgment without being 'objectively unreasonable.'"  *Id.*  The Minnesota Supreme Court did not apply *Brady* unreasonably and the claim should be denied.  *See Allen v. Minnesota Dep't of Corr.*, No. 13-CV-62 DSD/TNL, 2014 WL 25452, at *6 (D. Minn. Jan. 2, 2014) ("Petitioner does not demonstrate how these findings constitute an unreasonable application of federal law.  Because the Minnesota Court of Appeals did not unreasonably apply the standard set forth by the United States Supreme Court for the examination of *Brady* violations, Petitioner is not entitled to habeas relief on this ground.").  Given the breadth of evidence available at trial regarding his involvement with the murder of the victim, Thoreson has failed to show that the Minnesota Supreme Court unreasonably applied *Brady* to its analysis of the police interviews.  Therefore, this ground for habeas relief should be dismissed.

## V.    CERTIFICATE OF APPEALABILITY

A § 2254 habeas corpus petitioner cannot appeal an adverse ruling on his petition unless he is granted a certificate of appealability ("COA").  *See* 28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22(b)(1).  A COA cannot be granted unless the petitioner "has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  To make such a showing in this context, Thoresen must show "that jurists of reason would

find it debatable whether the district court was correct in its procedural ruling." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). This Court concludes that it is unlikely any other court, including the Eighth Circuit, would reach a conclusion contrary to that reached above, especially in light of the largely procedural mature of the decision. Accordingly, it is recommended that a COA not be issued in this matter.

## VI.   RECOMMENDATION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED THAT:**

1.   Petitioner Joseph Christian Thoresen's Application for a Writ of Habeas Corpus by a Person in State Custody arising under 28 U.S.C. § 2254 (Dkt. 1) be **DENIED**;

2.   That this action be **DISMISSED WITH PREJUDICE**; and

3.   No certificate of appealability be issued.


DATED: December 7, 2022              *s/Elizabeth Cowan Wright*
                                      ELIZABETH COWAN WRIGHT
                                      United States Magistrate Judge

## <u>NOTICE</u>

This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under District of Minnesota Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. D. Minn. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set for in D. Minn. LR 72.2(c).